Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, MICHAEL HANSON

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL HANSON, on behalf of himself and all similarly situated persons,<br><br>                    Plaintiff,<br><br>v.<br><br>HEAT MEDIA, INC. d/b/a Puck, a Delaware corporation,<br><br>                    Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

1

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1.    Plaintiff MICHAEL HANSON ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant HEAT MEDIA, INC. d/b/a Puck, a Delaware corporation ("Defendant" or "Puck"), and alleges as follows:

## I.    NATURE OF THE ACTION

2.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.puck.news (the "Website"), an online news platform that Defendant operates and provides for public access and use.

3.    During his use of the Website, Plaintiff navigated to multiple pages addressing sensitive personal subject matter, including articles concerning Democratic strategy on trans issues and political-donor influence schemes, unaware that Defendant was causing and permitting third parties to intercept the contents of his communications and to associate those contents with persistent, cross-session user identifiers.

4.    Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what he was searching for and reading, the page titles identifying the subject matter of those pages, the referrer URLs reflecting prior navigation paths, and persistent identifiers tying those communications to Plaintiff across browsing sessions.

5.    As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' communications with the Website, capture full page URLs and corresponding page titles, and transmit those contents alongside persistent user identifiers to the operators of those third-party tracking technologies for the third parties' own commercial purposes, including audience identity resolution, behavioral profiling, audience segmentation, and real-time ad targeting.

6.    Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Defendant has done so for years, generating revenue from the

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

surreptitious commercial exploitation of the contents of users' communications, including those of Plaintiff and the Class Members.

7.    Plaintiff personally used the Website during the class period and preserved an HTTP archive file (commonly known as a HAR file) of one of his own browsing sessions.  Counsel caused a technical investigation to be conducted that replicated URLs and user flows presented in Plaintiff's HAR file and that documented the third-party tracking transmissions described in this Complaint. The figures and screenshots reproduced below are from that investigation and are included herein as illustrative examples of how the Website's tracking technologies operated when Plaintiff visited the Website.

## II.    GENERAL ALLEGATIONS

8.    A web tracker is a tracking mechanism embedded in a website that monitors user interactions and transmits data to third-party servers. Trackers commonly take the form of small, transparent images, lightweight JavaScript files, software development kits ("SDKs"), or direct HTTP requests issued by the user's browser to third-party endpoints. Trackers operate automatically when a webpage loads, without requiring the user's knowledge or affirmative action.

9.    When triggered, trackers cause the user's browser to transmit data to third-party servers, including the contents of the user's communications with the host website such as page URLs identifying what the user is viewing, the corresponding page titles, and persistent identifiers that tie those communications to a particular user across browsing sessions.

10.    When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following (collectively, the "Trackers"):

- The AppLovin Tracker;
- The TikTok Tracker;
- The LinkedIn Tracker; and

3

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

- The Taboola Tracker.

11.     The third parties who operate the above-listed Trackers use the intercepted contents of users' communications collected via the Website for their own independent commercial purposes tied to broader advertising and audience-data ecosystems, including audience identity resolution, audience segmentation, behavioral profiling, real-time ad targeting, and cross-site identity resolution.

12.     The Trackers are operated by distinct third parties, including AppLovin Corporation (as to the AppLovin Tracker at b.applovin.com); TikTok Inc. (as to the TikTok Tracker); LinkedIn Corporation (as to the LinkedIn Insight Tracker); and Taboola, Inc., a registered California data broker (as to the Taboola Tracker). Each is an independent commercial actor that maintains its own infrastructure, controls its own platform, and processes data captured through the Trackers for its own purposes, separate from any service rendered to Defendant.

13.     Defendant knowingly embeds and deploys the Trackers on the Website and configures them to execute automatically within users' browsers during the page-load process. As a result, Defendant causes the browsers of California users, including Plaintiff and the Class Members, to transmit the contents of their communications with the Website, in real time and during the page-load process itself, to the third parties operating the Trackers.

14.     The third-party tracking code executes contemporaneously with each page load initiated by Plaintiff's browser. The page-load process for a modern webpage is not a single instantaneous event; it consists of many successive steps that the browser performs in sequence and in parallel, including the initial HTTP request and response for the page URL, the parsing of the returned HTML markup, the fetching and execution of embedded scripts (including the Trackers), the fetching of stylesheets, images, fonts, and other linked resources, and the rendering of the page to the user. During that same page-load process, before the page-load process completes, the Trackers cause the browser to issue separate, parallel outbound requests to third-party endpoints carrying

4

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the contents of Plaintiff's communications with the Website and persistent identifiers tied to Plaintiff. The interception of Plaintiff's communications by the Trackers is contemporaneous with, and occurs during, the transmission of those communications to Defendant.

15.    The technical mechanism that causes the Trackers' outbound requests to occur during, and not after, the page-load process is the standardized "async" attribute on HTML script elements. Under the HTML Living Standard maintained by the Web Hypertext Application Technology Working Group, when a script element carries the async attribute, "the classic script will be fetched in parallel to parsing."[1] An async script is therefore loaded and executed during the page-load process and does not wait for that process to finish.

16.    Each of the Trackers deployed on the Website is loaded into Plaintiff's browser asynchronously. LinkedIn, for example, openly acknowledges that its Insight Tag "loads asynchronously with the current website."[2] This asynchronous execution occurred in practice during Plaintiff's visit: the LinkedIn Insight Tag fired its first outbound request to LinkedIn approximately 8 milliseconds after the browser initiated the main document request for the article URLs at issue while the main document response was still in flight and before the page-load process had completed.

17.    Independent technical analysis of the Website's tracker architecture confirms that, during the page-load process, the AppLovin Tracker dispatches an outbound POST request to b.applovin.com, the TikTok Tracker dispatches an outbound POST request to analytics.tiktok.com, the LinkedIn Tracker dispatches outbound GET requests to px.ads.linkedin.com, and the Taboola Tracker dispatches outbound POST

---

[1] WHATWG, HTML Living Standard § 4.12.1 ("The script element") (defining behavior of the async attribute on external classic scripts), can be found online at https://html.spec.whatwg.org/multipage/scripting.html#attr-script-async (last visited June 18, 2026).
[2] LinkedIn, LinkedIn Insight Tag FAQs, can be found online at https://www.linkedin.com/help/lms/answer/a427660 (last visited June 18, 2026)

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

requests to trc.taboola.com and trc-events.taboola.com. Each of those tracker requests fires automatically, without any user interaction or affirmative action, and is dispatched during the page-load process before the page-load process completes, carrying the contents of the user's communications with the Website and persistent identifiers tied to the user.

18. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices, did not consent to the contents of their communications with the Website being transmitted to the third parties operating the Trackers, and did not consent to the use or commercial exploitation of those contents by Defendant or by the third parties.

19. Generalized references herein to users, visitors, and consumers expressly include Plaintiff and the Class Members.

## III.  PARTIES

20. Plaintiff MICHAEL HANSON is a California citizen residing in San Bernardino County, California, and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred on multiple occasions including but not limited to May 21, 2026.

21. Defendant HEAT MEDIA, INC. d/b/a Puck is a Delaware corporation with its principal place of business in New York. Heat Media, Inc. owns, operates, and controls the Website, an online news platform that Heat Media, Inc. publishes under the brand name "Puck." Heat Media, Inc. publishes news, commentary, and analysis to a national audience, including a significant audience of California users, and conducts publishing and digital-media business nationwide.

## IV.  JURISDICTION AND VENUE

22. Defendant is subject to personal jurisdiction in this District under Federal Rule of Civil Procedure 4(k)(1)(A) and California's long-arm statute, Cal. Code Civ. Proc. § 410.10. Defendant has cultivated California as a significant market for the Puck news platform, monetizes California users' engagement with the Website through the

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

sale of advertising and the activation of audience data, and integrates third-party tracking technologies that transmit California users' communications to data infrastructure operated by California-headquartered companies.

23. Defendant's own published privacy disclosures confirm the conduct alleged herein. In its Privacy Policy, Heat Media, Inc. acknowledges that it "automatically" collects "Log Data, such as your computer's IP address, browser type, browser version, the pages of our Sites that you visit, the time and date of your visit, the time spent on those pages and other statistics," and that such information "may be collected via several technologies, including cookies, web beacons, clear GIFs, canvas fingerprinting and other means."[3] Heat Media further acknowledges that "[w]ith respect to website cookies," Heat Media uses such information "to share with third-party marketing partners."[4]

24. Defendant's purposeful direction of its tracking infrastructure at California, its commercial monetization of California users, and its admissions in its own Privacy Policy are sufficient to support the exercise of personal jurisdiction in this District.

25. Plaintiff's claims arise out of and relate to Defendant's forum-related conduct. Plaintiff's communications were intercepted on his device in California, while Plaintiff was located in California, while Plaintiff was accessing the Website that Defendant directs at California users, and while California-headquartered tracking infrastructure was caused to receive the contents of those communications and persistent identifiers tied to Plaintiff.

26. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of the Federal

---

[3] Heat Media, Inc. Privacy Policy § 1 ("What Types of Personal Information Do We Collect?"), can be found online at https://puck.news/privacy/ (last visited June 18, 2026).

[4] Heat Media, Inc. Privacy Policy §§ 2-3 ("How Do We Use Personal Information?" and "How Do We Share Personal Information?"), can be found online at https://puck.news/privacy/ (last visited June 18, 2026).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Wiretap Act, 18 U.S.C. § 2511(1)(a).

27.   This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

28.   This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of the proposed Class, and at least one member of the proposed Class is a citizen of a state different from Defendant.

29.   Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendant regularly transacts business in this District, operates the Website that serves California residents in this District, and has caused tortious injury in this District through the interception of California residents' electronic communications; (2) a substantial part of the events giving rise to the claims occurred in this District, including the interception of Plaintiff's communications on his device in San Bernardino County; and (3) Defendant is subject to personal jurisdiction in this District.

## V.   FEDERAL AND STATE PRIVACY LAWS

### 1. The California Invasion of Privacy Act (CIPA)

30.   The California Invasion of Privacy Act ("CIPA") is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications.

31.   Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of electronic communications carried by wire, line, or cable.

32.   CIPA's text and history confirm that the Legislature intended to protect core

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. The statute provides for civil enforcement by private litigants whose communications have been intercepted without their consent.

33.    Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

### 2. The Federal Wiretap Act

34.    The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act ("ECPA") of 1986, prohibits the intentional interception of wire, oral, or electronic communications and provides a private right of action for individuals whose communications have been so intercepted.

35.    The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12).

36.    A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day per violation or $10,000, whichever is greater, plus punitive damages, equitable relief, and reasonable attorney's fees and costs.

## VI.    SPECIFIC ALLEGATIONS

37.    During his use of the Website, and as reflected in his HAR file, Plaintiff navigated to the following URLs, unaware that Defendant was causing and permitting Third Parties to intercept the content of his communications:

- https://puck.news/texas-senate-race-tests-democratic-strategy-on-trans-issues/; and
- https://puck.news/inside-sbfs-woke-shit-influence-scheme/.

38.    Plaintiff alleges on information and belief that the tracking mechanisms

described below operated on the Website during Plaintiff's visit to the URLs identified above and intercepted the substantive contents of his communications with the Website. The figures reproduced below reflect independent technical analysis of the Website's tracker architecture and depict the same tracker conduct that Plaintiff alleges operated during his visit.

### 1. The AppLovin Tracker

39. Defendant embedded and deployed an AppLovin tracking mechanism on the Website, operated by AppLovin Corporation through its Axon advertising platform. The AppLovin mechanism fires automatically during the page-load process and transmits data to b.applovin.com, including the full page URL of the page being viewed and the corresponding page title.

40. Figure 1 is a Fiddler Classic raw request capture showing an outbound POST request transmitted to AppLovin at b.applovin.com/v1/pixel during the load of the political trans article referenced above. The request body contains the parameter document.location.href set to the full page URL; the parameter title set to the corresponding plain-text page title; persistent AppLovin identifiers including a connectEventKey, session, and pixel-load UUIDs; and a visitInfo block recording first-visit timestamp, last-visit timestamp, and visit-count fields tying the request to the same user across browsing sessions.

/ / /

/ / /

/ / /

10

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 1**



41.    AppLovin's servers at b.applovin.com returned responses to the AppLovin requests, including HTTP responses confirming that AppLovin received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website, and before the page-load process completed.

42.    AppLovin Corporation and its operators used the intercepted contents of Plaintiff's communications with the Website, including the page URLs and the corresponding page titles, in conjunction with the persistent AppLovin identifiers and the visit-history fields, for their own independent commercial purposes, including audience identity resolution, behavioral profiling, audience segmentation, and real-time ad targeting.

43.    AppLovin Corporation is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted that interception by knowingly embedding and configuring the AppLovin Tracker on the Website.

/ / /

11

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

*2.  **The TikTok Tracker***

44.  Defendant embedded and deployed a TikTok tracking mechanism on the Website, operated by TikTok Inc. through its advertising platform. The TikTok mechanism fires automatically during the page-load process and transmits data to analytics.tiktok.com, including the full page URL of the page being viewed (in the page.url field), the referrer URL, and a persistent anonymous user identifier that ties those transmissions to a particular user across browsing sessions.

45.  Figure 2 is a Fiddler Classic raw request capture showing an outbound POST request transmitted to TikTok at analytics.tiktok.com/api/v2/pixel during the load of the political trans article identified above. The request body contains a page object with the url field set to the full page URL and the referrer field set to the prior page URL, together with a persistent TikTok anonymous user identifier. The page URL, the referrer, and the persistent identifier all appear together in the same outbound request.

**Figure 2**

46.  TikTok's servers at analytics.tiktok.com returned responses to the TikTok requests, including HTTP responses confirming that TikTok received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with

12

the Website, and before the page-load process completed.

47.    TikTok Inc. and its operators used the intercepted contents of Plaintiff's communications with the Website, including the page URLs and the corresponding referrer URLs, in conjunction with the persistent TikTok anonymous user identifier, for their own independent commercial purposes, including audience identity resolution, behavioral profiling, audience segmentation, and real-time ad targeting on the TikTok platform.

48.    TikTok Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted that interception by knowingly embedding and configuring the TikTok Tracker on the Website.

### 3.    The LinkedIn Tracker

49.    Defendant embedded and deployed a LinkedIn Insight Tag tracking mechanism on the Website, operated by LinkedIn Corporation through its advertising platform. The LinkedIn mechanism fires automatically during the page-load process and transmits data to px.ads.linkedin.com, including the full page URL of the page being viewed, and a persistent LinkedIn advertising identifier that ties those transmissions to a particular user across browsing sessions.

50.    Figure 3 is a Fiddler Classic raw request capture showing an outbound request transmitted to LinkedIn at px.ads.linkedin.com/collect during the load of the political trans article identified above. The request contains the query parameter url set to the full page URL and a persistent LinkedIn advertising identifier carried in the outbound Cookie header. The page URL and the persistent identifier all appear together in the same outbound request.

///

///

13

**Figure 3**



51.    LinkedIn's servers at px.ads.linkedin.com returned responses to the LinkedIn requests, including HTTP responses confirming that LinkedIn received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website, and before the page-load process completed.

52.    LinkedIn Corporation and its operators used the intercepted contents of Plaintiff's communications with the Website, including the page URLs, in conjunction with the persistent LinkedIn advertising identifier, for their own independent commercial purposes, including audience identity resolution, behavioral profiling, audience segmentation, retargeting, and demographic analytics across the LinkedIn platform.

53.    LinkedIn Corporation is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted that interception by knowingly embedding and configuring the LinkedIn Tracker on the Website.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## 4.    The Taboola Tracker

54.    Defendant embedded and deployed a Taboola tracking mechanism on the Website, operated by Taboola, Inc. through its content-recommendation and audience-targeting platform. The Taboola mechanism fires automatically during the page-load process and transmits data to trc.taboola.com and trc-events.taboola.com, including the full page URL of the page being viewed and the article slug, and a persistent Taboola global visitor identifier that ties those transmissions to a particular user across browsing sessions.

55.    Figure 4 is a Fiddler Classic raw request capture showing an outbound POST request transmitted to Taboola at trc.taboola.com during the load of the political trans article identified above. The request body contains a data object with the item-id field set to the article slug, the item-url field set to the full page URL, and a persistent Taboola global visitor identifier. The page URL, the article slug, and the persistent identifier all appear together in the same outbound request.

**Figure 4**

56.    Taboola's servers at trc.taboola.com returned responses to the Taboola

requests, including HTTP responses confirming that Taboola received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website, and before the page-load process completed.

57.    Taboola, Inc. and its operators used the intercepted contents of Plaintiff's communications with the Website, including the page URLs and article slugs, in conjunction with the persistent Taboola global visitor identifier, for their own independent commercial purposes, including audience identity resolution, behavioral profiling, audience segmentation, content recommendation, and real-time ad targeting.

58.    Taboola, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted that interception by knowingly embedding and configuring the Taboola Tracker on the Website.

### 5.    *Persistent Identifiers Stored in the Browser*

59.    Figure 5 is a Chrome DevTools Application panel capture showing the browser's cookie storage during the load of the SBF influence-scheme article identified above. The Cookies panel reflects persistent cookies set by and tied to the Trackers, including the LinkedIn bcookie set on the .linkedin.com domain with an expiration of approximately one year in the future, and the TikTok _ttp cookie set on the .tiktok.com domain with an expiration of approximately thirteen months. These persistent cookies enable cross-session user tracking and behavioral profiling tied to the sensitive content being accessed on the Website.

/ / /

/ / /

/ / /

16

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 5**



60.    The AppLovin Tracker and the Taboola Tracker set persistent identifiers in the Plaintiff's browser in the same manner. During the load of the articles identified above, the AppLovin Tracker set the persistent identifier lc2_fpi on the .puck.news domain with an expiration of approximately thirteen months in the future, and the Taboola Tracker, at trc.taboola.com and trc-events.taboola.com, set persistent identifiers on the .taboola.com domain, including t_gid and t_pt_gid, each with an expiration of approximately one year in the future. These AppLovin and Taboola persistent cookies enable cross-session user tracking and behavioral profiling tied to Plaintiff's visits to the sensitive content on the Website in the same manner as the LinkedIn and TikTok cookies depicted in Figure 5.

## VII.  CLASS ALLEGATIONS

61.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website, were intercepted by one or more Trackers between May 21, 2025 and the present.

62.    **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant. Joinder of all Class Members is impracticable, and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

63.    **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;
- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether Defendant's conduct violates the California Constitution;
- Whether Defendant's conduct constitutes an intrusion upon seclusion;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained; and
- Whether Class Members are entitled to restitution.

64.    **TYPICALITY:** As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the Class Members. Plaintiff's experience with the Trackers is typical to Class Members, who likewise had their URL contents intercepted by the Trackers and transmitted to third parties.

65. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially in conflict with those of the Class are excluded from the Class.

66. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not.

## VIII.  FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

### By Plaintiff and the Class Members Against Defendant

67. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

68. Plaintiff brings this cause of action on behalf of himself and the Class.

69. California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state. The statute further prohibits aiding, agreeing with, employing, or conspiring with any person to do the same.

70. The full URLs of Plaintiff's and Class members' HTTP requests to the Website constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, the Trackers intercepted those URL contents, paired them with persistent user identifiers in the same outbound requests, and transmitted them to third-party servers in real time and during

the page-load process.

71.    Defendant intentionally configured the Website to transmit Plaintiff's and Class members' URL contents to the Trackers, itself received and used those URL contents for audience segmentation and ad targeting, and permitted the Trackers to use those URL contents for their own independent commercial purposes, all without Plaintiff's or Class members' knowledge or consent.

72.    Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and reasonable attorney's fees and costs.

## IX.    SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

### By Plaintiff and the Class Members Against Defendant

73.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

74.    Plaintiff brings this cause of action on behalf of himself and the Class.

75.    18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

76.    The full URLs of Plaintiff's and Class members' HTTP requests to the Website are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8). Those URLs communicate the substance and meaning of Plaintiff's and Class members' communications with the Website, including what they were viewing and what subject matter they were researching.

77.    Defendant intentionally configured the Website to transmit Plaintiff's and Class members' URL contents to each Tracker, itself received and used those URL contents for audience segmentation and ad targeting, and permitted each Tracker to use

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

those URL contents for its own independent commercial purposes.

78. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendant through the interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, plus punitive damages, equitable relief, and reasonable attorney's fees and costs.

## X.    THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### By Plaintiff and the Class Members Against Defendant

79. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

80. Plaintiff brings this cause of action on behalf of himself and the Class.

81. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an unlawful and an unfair business practice.

82. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a).

83. Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class members' URL contents to third-party Trackers for commercial monetization without disclosure, authorization, or compensation. The harm to Plaintiff and Class members substantially outweighs any utility of Defendant's conduct, the conduct is immoral, unethical, oppressive, and unscrupulous, and the conduct violates established public policy as reflected in the California Invasion of Privacy Act, the Federal Wiretap Act, and Article I, Section 1 of the California Constitution.

84. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific content a user views, including browsing URLs of the kind intercepted here, has

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

recognized economic value in the digital advertising marketplace. Defendant and the Trackers monetized that data without compensating Plaintiff or the Class Members.

85.    Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendant and the Trackers are deemed unjustly enriched in the amount of that uncompensated transfer of value.

86.    Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair practices, restitution of monies acquired by Defendant through those practices, and reasonable attorney's fees and costs.

## XI.    FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

### By Plaintiff and the Class Members Against Defendant

87.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

88.    Plaintiff brings this cause of action on behalf of himself and the Class.

89.    Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish (1) a legally protected privacy interest, (2) a reasonable expectation of privacy in the circumstances, and (3) conduct constituting a serious invasion of privacy.

90.    Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs reflecting their search queries and browsing activity. California law recognizes a substantial privacy interest in the substance of an individual's electronic communications, including communications that reveal the user's areas of interest, the questions the user is researching, and the personal subject matter the user is consuming.

91.    Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person

visiting an online news website does not expect that the specific URLs identifying the search queries the user submitted and the articles the user read will be transmitted in real time to multiple third-party commercial entities and paired with persistent identifiers tying those communications to the user across browsing sessions.

92.     Defendant's conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring four third-party tracking technologies on the Website, Defendant caused the real-time, covert interception of the URL contents of Plaintiff's and Class Members' electronic communications, and caused those contents to be paired with persistent user identifiers and transmitted to multiple third-party commercial entities for commercial exploitation.

93.     As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing data.

## XII.   FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

### By Plaintiff and the Class Members Against Defendant

94.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

95.     Plaintiff brings this cause of action on behalf of himself and the Class.

96.     The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

97.     Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding four third-party tracking technologies that intercepted the URL contents of those communications, paired those contents with persistent user identifiers, and transmitted them to third-party

commercial entities in real time and during the page-load process.

98.    The intrusion is highly offensive to a reasonable person. Defendant covertly deployed tracking technologies that captured the specific content Plaintiff was searching for and reading and transmitted it to multiple third-party commercial entities for audience identity resolution, behavioral profiling, audience segmentation, and broader commercial exploitation, all without disclosure or consent.

99.    As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class are entitled to compensatory and nominal damages.

## XIII.  SIXTH CAUSE OF ACTION

### Unjust Enrichment

### By Plaintiff and the Class Members Against Defendant

100.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

101.    Plaintiff brings this cause of action on behalf of himself and the Class.

102.    Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

103.    Defendant received a benefit by permitting third parties to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website, Defendant received monetary compensation and access to audience-targeting capabilities that supported the sale of advertising on the Website.

104.    Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting and monetizing that data without disclosure or compensation, Defendant deprived Plaintiff

24

and Class Members of the value of their browsing data.

105.   It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the tracking conduct, and its failure to disclose the existence and operation of the Trackers in a manner that would permit informed consent, render its retention of the benefits unjust.

106.   Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense.

## XIV.  PRAYER FOR RELIEF

107.   WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion and unjust enrichment;

3. An order enjoining Defendant from continuing the conduct alleged herein;

4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;

5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendant through the violation, or $100 per day per violation or $10,000, whichever is greater;

6. Punitive damages pursuant to 18 U.S.C. § 2520;

7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;

8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;

9. Compensatory and nominal damages for intrusion upon seclusion;

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

10. Restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense;

11. Prejudgment interest;

12. Reasonable attorney's fees and costs; and

13. Such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

108.   Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated:   July 2, 2026      **NATHAN & ASSOCIATES, APC**


By: */s/ Reuben D. Nathan*
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

*Attorneys for Plaintiff and the Putative Class*

26

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED